UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

UNITED STATES OF AMERICA,

     -against-

KENNETH E. MAHAFFY, JR.,
TIMOTHY J. O'CONNELL,              <u>MEMORANDUM AND ORDER</u>
DAVID G. GHYSELS, JR.,                05-CR-613
ROBERT F. MALIN,
LINUS NWAIGWE,
MICHAEL A. PICONE, and
KEEVIN H. LEONARD,
                      Defendants.

-------------------------------------------------x

GLASSER, United States Senior District Judge

## **INTRODUCTION**

      In this prosecution, defendants Kenneth E. Mahaffy, Jr. ("Mahaffy"), Timothy J. O'Connell ("O'Connell"), David G. Ghysels, Jr. ("Ghysels"), Robert F. Malin ("Malin"), Linus Nwaigwe ("Nwaigwe"), Michael A. Picone ("Picone"), and Keevin H. Leonard ("Leonard"), have been charged in an Indictment alleging securities fraud offenses pursuant to 18 U.S.C. §§ 1348 and 1349; and conspiracy to violate and violation of the Travel Act, 18 U.S.C. §§ 371, 1952(a)(3). O'Connell is also charged with conspiracy to commit witness tampering and witness tampering, 18 U.S.C. § 1512. O'Connell, Mahaffy, Nwaigwe, and Picone are charged with the making of false statements in violation of 18 U.S.C. § 1001. Before the Court are defendants' motions to dismiss for insufficiency of the Indictment and lack of venue.

## **BACKGROUND ALLEGATIONS**

      The charges in this case stem from an alleged operation in which day trading

defendants made payments to defendant stockbrokers for access to non-public information. The non-public information concerned pending orders, from institutional clients of the brokerage firms, for the purchase or sale of large blocks of securities. The day trading defendants, and others, used that information to purchase or sell the subject securities prior to the brokerage firms' execution of their clients' orders. The Indictment describes this operation as a "front-running" scheme, which:

> harms a brokerage firm's customers because it allows the stock trader to take advantage of limited opportunities to purchase and sell the same securities in which the firm's customers are interested before the customers are able to do so. As a result, the firm's customers may not obtain as favorable a price as they would have absent the front-running.

(Id., ¶ 15).

## I.      The Defendants and Other Relevant Persons

### A.      A.B. Watley and Related Day Traders

The A.B. Watley Group ("Watley"), which operated primarily as a day trading firm, was a broker-dealer of securities registered with the United States Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") and maintained its principal office at 40 Wall Street, New York, New York. Watley also maintained several branch offices, including offices in Forest Hills, New York and Melville, New York.

Defendant Robert F. Malin was Vice-Chairman of the Board of Directors and President of Watley. He worked at Watley's principal office, managed Watley's business activities and supervised its day traders. Defendant Linus Nwaigwe was Watley's Director of Compliance, responsible for ensuring that Watley's employees complied with federal

securities laws and followed SEC rules and regulations.  In December 2002,[1] Defendant Michael Picone was Chief Operating Officer of Watley.  In August 2003, Picone entered into a consulting agreement with Watley.  Between August 2003 and July 2005, Picone provided various financial and accounting services to Watley pursuant to this agreement.  Defendant Keevin Leonard managed, supervised and trained Watley's day traders.  He was also licensed by the NASD to act as a stockbroker and a General Securities Principal.

Millennium Brokerage, LLC ("Millennium") was a broker-dealer of securities registered with the SEC and NASD, and maintained its principal office in Woodcliff, New Jersey.  Millennium also maintained a branch office at 3 Park Avenue, New York, New York.  Millennium was a day trading firm.  In March, 2003, a group of former Watley day traders began working at Millennium's Park Avenue branch.

E*Trade Professional Trading, LLC ("E*Trade") was also a registered broker-dealer and maintained its principal office at 135 East 57th Street, New York, New York.  E*Trade also sold an electronic trading platform that was marketed to professional stock traders.  In October 2003, a group of former Watley traders began day trading on behalf of a hedge fund called Ellis Island Trading ("Ellis Island"), which used E*Trade's trading platform.  Ellis Island was located in the Amex Building in New York, New York.  In December 2003, the same group of day traders terminated their relationship and became employed at E*Trade's principal office.  The day traders continued to be employed at E*Trade until at least February 2004.

**B.     The Stockbrokers**

---

[1]  All dates are alleged approximately.

Defendant Kenneth Mahaffy, Jr. was a stockbroker licensed by the NASD. Between 1997 and February 2003, Mahaffy was employed as a stockbroker at a branch office of Merrill Lynch & Co., Inc. ("Merrill Lynch") located at 1325 Franklin Avenue, Garden City, New York. Between February 2003 and June 2005, Mahaffy was employed as a stockbroker by Smith Barney, a division of Citigroup Global Markets, Inc. ("Citigroup"). Mahaffy was employed at a branch office of Citigroup located at 401 Broad Hollow Road, Melville, New York. Merrill Lynch and Citigroup were both broker-dealers of securities registered with the SEC and the NASD.

Defendant Timothy J. O'Connell was a stockbroker licensed by the NASD. Between 1997 and February 2005, O'Connell was employed as a stockbroker at Merrill Lynch's Garden City branch. Between 2001 and February 2003, O'Connell and Mahaffy shared client commissions and worked together as partners at Merrill Lynch's Garden City branch.

Defendant David G. Ghysels, Jr. was a stock broker licensed by the NASD. Between March 2001 and April 2003, Ghysels was employed as a stock broker at a branch office of Lehman Brothers ("Lehman"), located in Palm Beach, Florida.

Ralph Casbarro was a stockbroker licensed by the NASD. Between 1998 and March 2005, Casbarro was employed as a stockbroker at a branch office of Citigroup located at 1345 Avenue of the Americas, New York, NY.

Defendant Paul Coughlin was a stockbroker licensed by the NASD. Between 1995 and December 2005, Coughlin was employed by Merrill Lynch as a stockbroker at a Merrill Lynch branch office located at 1251 Avenue of the Americas, New York, NY.

As stockbrokers at Merrill Lynch, Citigroup and Lehman (collectively, the "Brokerage Firms"), Mahaffy, O'Connell, and Coughlin each owed fiduciary and other duties of trust

and confidentiality to their respective Brokerage Firms and the clients of their respective firms.

## II.    The "Front-Running" Scheme

According to the Indictment, between January 2002 and February 2004, Mahaffy, O'Connell, Ghysels, Malin, Nwaigwe, Picone and Leonard, with others, participated in a fraudulent "front-running" scheme. Stockbrokers Mahaffy, O'Connell and Ghysels, in violation of their fiduciary and other duties of trust and confidence owed to their employers and their Brokerage Firms' clients, provided day traders at Watley, Millennium, Ellis Island and E*Trade (the "Day Traders") with customer order information by permitting the Day Traders to secretly listen to their Brokerage Firms' internal speaker systems known as "squawk boxes." The information broadcast through the squawk boxes included material, non-public information concerning large orders to purchase and sell securities that had been placed with the Brokerage Firms by their institutional clients. The large orders involved quantities of securities that were sufficiently large that the transactions could be expected to influence the market price for the securities in question.

The Day Traders then used the information disseminated through the squawk boxes to purchase and sell those securities prior to the Brokerage Firms' execution of their clients' orders. Thus, for example, when the squawk boxes disseminated information concerning a large order to buy a particular stock, the Day Traders would purchase shares of the same stock before the larger buy order was executed, expecting that the imminent execution of the large buy order would cause the market price of the particular stock to rise. Conversely, when the squawk boxes disseminated information concerning a large order to sell a particular stock, the Day Traders would short sell the same securities before the larger sell

order was executed, expecting that the imminent execution of the large sell order would cause the market price of the particular stock to fall. The Watley Day traders engaged in this illegal trading activity at the direction and under the supervision of Malin, Nwaigwe, Picone, and Leonard.

In exchange for access to the Brokerage Firms' squawk boxes, the Day Traders paid bribes in the form of cash, commissions and other things of value to Mahaffy, O'Connell and Ghysels. One method by which the Day Traders bribed the brokers was by generating commissions through the execution of "wash trades." The "wash trades" consisted of prearranged pairs of trades of the same securities between different accounts that the Day Traders maintained at various firms, including the Brokerage Firms. Typically, the Day Traders executed the wash trades by simultaneously placing orders to (1) purchase a block of stock at a particular price through one Brokerage Firm account; and (2) sell a similarly sized block of the same stock at the same price through a different Brokerage Firm account. The wash trades involved no net change in beneficial ownership of stock and had no legitimate investment purpose, and were executed solely as a means of generating commissions for Mahaffy, O'Connell, Ghysels and others. Between January 2002 and September 2003, Leonard coordinated the execution of wash trades through Watley's accounts at the Brokerage Firms. During this period, he also regularly collected cash from the Watley Day Traders for "desk fees," the purpose of which was to, among other things, reimburse Watley for the cash and commissions paid to the brokers in exchange for access to the squawk boxes.

In the fall of 2003, Malin and Picone tried to find new sources of squawk box access for A.B. Watley. Between September 2003 and February 2004, Malin, Picone and others

agreed to pay secret bribes to Coughlin in exchange for access to Merrill Lynch's squawk box. During this period, Malin and Picone caused a Watley Day Trader to deliver cash bribes to Coughlin of approximately $1,000 per month. They provided the trader with the cash to make the bribe payments by causing Watley to issue reimbursement checks to the trader for bogus business expenses.

## III. The Cover Up, Obstruction and False Statements

### A. Efforts to hide squawk box access from NASD

Between January 2002 and February 2004, Watley typically provided its Day Traders with squawk box access using a system of external speakers and speaker phones that had been installed throughout the firm's trading floor. At various times during this period, NASD examiners visited Watley's New York City office to conduct compliance examinations.

Malin, Nwaigwe, Leonard and others concealed Watley's squawk box access from the NASD by, among other things, causing the Watley Day Traders to listen to the squawk boxes through headsets, rather than the external speaker systems, while the NASD examiners were present at Watley's New York City office. Furthermore, in approximately January 2004, a NASD examiner questioned Nwaigwe about the squawk boxes after hearing them being broadcast over a speaker phone near the trading floor. Nwaigwe falsely told the NASD examiner, in substance and in part, that the sounds coming across the speaker phone were internal communications between day traders located on different floors within the office.

### B. O'Connell's efforts to obstruct justice

Between December 2003 and April 2005, O'Connell and others devised false cover

stories to provide to the SEC, law enforcement authorities and internal investigators at Merrill Lynch for the purpose of concealing O'Connell's participation in the fraudulent scheme. In December 2003, O'Connell was interviewed by members of Merrill Lynch's internal compliance staff who were investigating O'Connell's use of Merrill Lynch's squawk box. During this interview he falsely stated that he had never allowed day traders at Millennium to listen to Merrill Lynch's squawk box.

In May 2004, a grand jury in the Eastern District of New York began investigating the Defendants' involvement in the fraudulent front-running scheme. On or about June 7, 2004, a United States Postal Inspector interviewed O'Connell. During this interview, O'Connell falsely stated, in part, that he had not provided the Day Traders with access to Merrill Lynch's squawk box.

In November 2004, O'Connell became aware that the SEC and law enforcement authorities were seeking to interview his assistant at Merrill Lynch. O'Connell directed her to lie to law enforcement authorities and the SEC concerning, among other things, O'Connell's use of Merrill Lynch's squawk box. The assistant followed O'Connell's instructions and falsely stated that she had no knowledge of O'Connell providing the Day Traders with access to Merrill Lynch's squawk box.

In February 2005, O'Connell became aware that his assistant had been subpoenaed by the grand jury in connection with its investigations. He instructed her to lie to the grand jury, again about his use of the squawk box. Accordingly, she falsely denied before the grand jury any knowledge of O'Connell providing the Day Traders with access to Merrill Lynch's squawk box.

**C.**     **Mahaffy's false statements to law enforcement and the SEC**

On March 28, 2005, Mahaffy participated in an interview at the United States Attorney's Office in Brooklyn, New York, with the Postal Inspector and several SEC staff members. During this interview, Mahaffy falsely stated that he only placed the receiver of an open telephone line in close proximity to Merrill Lynch's squawk box for short periods of time so that his clients could listen to Merrill Lynch analysts who sometimes used the squawk boxes to disseminate investment advice. In fact, Mahaffy routinely and deliberately placed the receiver of an open telephone line next to Merrill Lynch's squawk box for lengthy portions of the trading day for the purpose of providing the Day Traders with confidential customer order information.

On April 4, 2005, Mahaffy participated in another interview at the United States Attorney's Office in Brooklyn, New York. During this interview, he falsely stated that while he often communicated with certain clients through an open telephone line in his Citigroup office, he typically kept the line muted for lengthy portions of the trading day. He further stated that he believed this would make it difficult for the clients on the open line to listen to his Citigroup squawk box. In fact, between February 2003 and November 2003, Mahaffy routinely and deliberately used the open telephone line in his office to provide the Day Traders with access to Citigroup's squawk box for lengthy portions of the trading day.

**D.    Nwaigwe's false statements to law enforcement and the SEC**

On November 3, 2004, Nwaigwe appeared before the SEC in New York, New York pursuant to a subpoena and gave testimony under oath in connection with the SEC Investigation. Prior to testifying, Nwaigwe was informed by Watley's counsel that his SEC testimony would be shared with the United States Attorney's Office for the Eastern District of New York. Nwaigwe falsely testified that (a) he had first heard the term "squawk box"

when he saw it mentioned in the subpoena he received from the SEC; and (b) he had never heard the term "box" in connection with proprietary trading at Watley. In fact, Nwaigwe then and there knew and believed that between February 2002 and February 2004, the Watley Day Traders had routinely listened to and purchased and sold securities based on material, non-public information derived from devices known as squawk boxes.

On July 12, 2005, Nwaigwe participated in an interview at the United States Attorney's Office in Brooklyn, New York. During this interview, Nwaigwe reviewed a portion of a transcript of his SEC testimony that contained the false statements described above. He told the Postal Inspector that the statements set forth in his SEC testimony transcript were accurate, when in fact, he knew and believed that the statements were false.

### E. Picone's false statements to the SEC

On July 20, 2005, Picone appeared before the SEC in New York, New York, pursuant to a subpoena and testified under oath in connection with the SEC Investigation. Prior to testifying, Picone had been informed by, among others, Malin, that the United States Attorney's Office for the Eastern District of New York was conducting a parallel criminal investigation regarding the same subject matter as the SEC Investigation. Prior to testifying, Picone was presented with and reviewed a Form 1662, which stated that the SEC "often makes its files available to other governmental agencies, particularly Untied States Attorneys and state prosecutors.

Picone falsely testified before the SEC that (a) he approved a $1,000 expense payment from Watley to a Day Trader in or about November 2003 so that the trader could bring a Merrill Lynch broker to an adult entertainment establishment; (b) he believed that the trader was attempting to develop a business relationship with the broker that would

allow Watley to obtain access to secondary securities offerings through Merrill Lynch; and (c) he did not believe that the trader planned to use the $1,000 to compensate the broker for providing Watley with access to Merrill Lynch's squawk box. In fact, Picone knew that the $1,000 expense reimbursement check was for the purpose of providing the trader with funds to compensate Coughlin for providing the Watley Day Traders with access to Merrill Lynch's squawk box.

## DISCUSSION

### I. Defendants' Motions to Dismiss for Lack of Venue

Ghysels has moved to dismiss the substantive securities fraud charges against him, Counts Two through Four, Six, and Seven, as well as the Travel Act charges against him, Counts Twenty-four and Twenty-six, for lack of venue. He asserts that none of the alleged conduct essential to conviction under those counts occurred within the Eastern District of New York, and that venue would be proper only in either the Southern District of Florida, where he worked as a stockbroker at Lehman Brothers's Palm Beach office, or the Southern District of New York, where Watley traders had their Wall Street offices. Similarly, Nwaigwe and Picone move to dismiss Counts Thirty-Nine and Forty-One, charging them, respectively, with making false statements. They allege that the statements at issue were all made in the Southern District of New York.

The Court forebears from a detailed restatement of the foundational principles and constitutional basis of the criminal venue requirements, aptly stated in United States v. Saavedra, 223 F.3d 85 (2d Cir.2000). It suffices to state that as interpreted by United States v. Cabrales, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) and United States v. Rodriguez-Moreno, 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999), the Government

must prove, by a preponderance of the evidence, that conduct essential to the crime charged occurred within the district where the prosecution is brought. Where the charged crime was committed in more than one district, the government must prove that the crime was either "begun, continued, or completed" in the district where the prosecution is brought. 18 U.S.C. § 3237. Venue must be proper as to each count; and "[w]here, as in the case at hand, a defendant is charged with conspiracy as well as substantive offenses, venue must be laid in a district where all the counts may be tried." Saavedra, 223 F.3d 85, 89 (2d Cir.2000).

The charges against Ghysels, Counts Two through Four, Six, Seven, Twenty-Four, and Twenty-Six, all allege that the offenses occurred "within the Eastern District of New York and elsewhere." Notably, the defendant has failed to cite any precedent where a court has dismissed for lack of venue notwithstanding a specific allegation in the Indictment that the offenses took place within the district where the prosecution was brought. This Court has previously concluded that "the indictment, alleging on its face that the offenses occurred 'within the Eastern District of New York and elsewhere,' suffices to sustain it against . . . pretrial attack on venue." United States v. Bellomo, 263 F.Supp.2d 561, 579 (E.D.N.Y.2003). See also United States v. Stein, 429 F.Supp.2d 633, 643 (S.D.N.Y.2006) ("[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied."). The Court declines to dismiss these Counts at this time, but as it ruled in Bellomo, "[t]he defendant may renew his motion to dismiss on venue grounds after the government's case in chief has been presented, and again, if need be, at the end of the entire case." Bellomo, 263 F.Supp.2d at 579.

Because Counts Thirty-nine and Forty-one, alleging that Nwaigwe and Picone made false statements in violation of 18 U.S.C. § 1001, do not explicitly allege that the offense took

place in the Eastern District of New York, some additional discussion of the propriety of this venue is appropriate at this point. The allegedly false statements were made not in the Eastern District of New York, but at the SEC office in Manhattan, in the Southern District of New York. Thus, the Indictment alleges that they occurred "within the Southern District of New York and elsewhere." The Indictment also alleges, however, that "[p]rior to testifying," at the SEC offices, Nwaigwe "was informed by A.B. Watley's counsel that his SEC testimony would be shared with the United States Attorney's Office for the Eastern District of New York." And Picone, the Indictment alleges, was aware that the Eastern District United States Attorney had opened an investigation into the matter about which he was testifying. The Defendants argue that none of the conduct essential to these alleged offenses occurred in the Eastern District of New York, and that the Indictment fails to set forth sufficient allegations on which venue could be found proper.

The seminal controlling case in this Circuit is <u>United States v. Candella</u>, 487 F.2d 1223 (2d Cir.1974). There, the defendants were convicted under the same section, 18 U.S.C. § 1001, of making false statements in an effort to obtain reimbursement of expenses from a federal program that was administered by the City. It was undisputed that the false affidavits were prepared and executed in Brooklyn, accepted by City officials in Brooklyn, and only then conveyed to the Manhattan office of the City of New York, Department of Relocation, for review and approval. The Court held that venue was proper in the Southern District of New York, noting that "[t]he false statements here were intended to produce funds. The statements continued to be false and continued to be within the jurisdiction of the United States not only when initially presented but also upon arrival in Manhattan where the decision was reached to make the funds available." <u>Id.</u> at 1228. "[V]enue is

properly laid in 'the whole area through which force propelled by an offender operates.' The force propelled here by the defendants immediately contemplated Manhattan." Id. (citing United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 90 L.Ed. 562 (1944)). See also United States v. Stephenson, 895 F.2d 867, 875 (2d Cir.1990) (extending Candella to oral statements made between two districts).

Candella has been criticized for its expansiveness; conspicuously absent from the Court's opinion is a statement requiring either knowledge or intent on the part of the defendant that the affidavits would be delivered to Manhattan. The closest to such a statement was the Court's observation that "[t]he force propelled here by the defendants immediately contemplated Manhattan," Candella, 487 F.2d 1228, which strictly, and somewhat cryptically, says nothing about the defendant's mental state. An expansive interpretation, essentially imposing strict liability for the making of false statements in assessing venue, was apparently confirmed in United States v. Ramirez, 420 F.3d 134, 142-43 (2d Cir.2005). In that case, the defendant filed false statements with the New Jersey Department of Labor as part of an effort to fraudulently obtain immigration visas. Those documents were forwarded to the United States Department of Labor in Manhattan, where the prosecution was brought. Applying Candella, the Court of Appeals found venue proper in the Southern District of New York. The Court rejected Defendant's attempt to distinguish Candella:

> [The defendant] Vittug seeks to distinguish Candella on the ground that the N.J. DOL was not a mere conduit of the documents, but rather had the duty to review and process them and the power to reject or deny them. Whether or not the New Jersey agency reviewed the applications, however, the fact is that it forwarded them to the U.S. DOL in the Southern District of New York. As we said in Candella, "[a]lthough enough was done in the Eastern District [of New York] to constitute a crime there . . . it does not follow that the crime

then terminated, and that what transpired in Manhattan was irrelevant for venue purposes." Candella, 487 F.2d at 1228.  Thus, venue was properly laid in the Southern District of New York because Vittug's "statements continued to be false and continued to be within the jurisdiction of the United States" when they finally reached Manhattan. Candella, 487 F.2d at 1228.

Ramirez, 420 F.3d at 143.

Defendants rely upon United States v. Bin Laden, 146 F.Supp.2d 373 (S.D.N.Y.2001), in which the district court distinguished Candella and held venue to be improper in the Southern District of New York.  In Bin Laden, FBI agents conducting an investigation on behalf of the United States Attorney for the Southern District of New York interviewed Mr. El Hage at the FBI field office in Dallas, Texas.  Mr. El Hage made statements alleged to be false.  The district court in Bin Laden held that the Southern District of New York was an improper venue for the ensuing false statement charge, distinguishing  Candella and its progeny on the basis that in Bin Laden, there was no "geographic discontinuity between the defendant's physical making of the disputed statement . . . and the actual receipt of that statement by the relevant federal authority."  Bin Laden, 146 F.Supp.2d at 376 (emphasis in original).  The court found it "telling" that "the Candella court equated the role played by the unnamed city officials in Brooklyn with that of the post office," and that "among the four offense elements necessary to prove Mr. El Hage's section 1001(a)(2) violation, not one involves evidence arising out of this judicial district."  Id. at 378,  377.[2]

In light of the expansive interpretation of Candella offered in Ramirez, the district court in Bin Laden might have ruled differently.  Whereas Bin Laden holds dispositive the

_____

[2]  The Government must prove (1) a material statement or representation; (2) its falseness; (3) the mens rea of knowledge or willfulness; and (4) the statement was made within the jurisdiction of the United States.  See L. Sand, et al., Modern Federal Jury Instructions, ¶ 36.01, Inst. 36-8.  The court assumed without explanation that evidence of materiality, the first element of the offense, would not arise out of the Southern District of New York investigation.

determination of whether a geographic discontinuity exists between the making and receipt of the statement, highlighting the facts in Candella and the conduit-like transfer of the statement from the Eastern District to the City's Southern District central office, Ramirez holds paramount the broader language of Candella that "[a]lthough enough was done in the Eastern District [of New York] to constitute a crime there . . . it does not follow that the crime then terminated, and that what transpired in Manhattan was irrelevant for venue purposes," emphasizing that even if the intermediary agency has an independent obligation to review the statement and the power to act upon it, it is the fact that the false statement actually makes its way into another district that establishes venue. Ramirez, 420 F.3d at 143 (citing Candella, 487 F.2d at 1228). Assuming that the FBI agents in Bin Laden were part and parcel of the Southern District of New York investigation, and that there was thus no "transfer" between any receiving agency in Texas and the prosecuting attorneys in the Southern District of New York, Ramirez nonetheless implies that the absence of a transfer need not undermine an application of the continuing offense doctrine.[3]

If applied ad absurdum, Candella and Ramirez allow for the possibility that venue might be proper in a district far removed from either the defendant's actual presence or any knowing or intended effect of his statements. As noted by the Ninth Circuit, "a result of this analysis is that venue will often be possible in districts with which the defendant had no personal connection, and which may occasionally be distant from where the defendant

---

[3] This case also survives Bin Laden's distinction because while that court found unity in the investigation of the FBI and Southern District attorneys, thus making impossible any geographic discontinuity between the receiving agency and the "relevant federal authority," here the parallel investigations conducted by the SEC and the United States Attorney provide the basis for finding geographic discontinuity: The SEC investigation pursuant to which these statements were taken was based in the Southern District of New York. But the "relevant federal authority" for the purpose of this prosecution is the United States Attorney of the Eastern District of New York.

originated the actions constituting the offense." United States v. Angotti, 105 F.3d 539, 543 (9th Cir.1997) (following Candella).

Two constraints rein the expansive reach of venue under Candella. First, "[t]o determine whether the application of a venue provision in a given prosecution comports with constitutional safeguards, a court should ask whether the criminal acts in question bear 'substantial contacts' with any given venue." Saavedra, 223 F.3d at 92-93. This test, requires taking into account "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding." Saavedra, 223 F.3d at 93. See also United States v. Ramirez, 420 F.3d at 139. Second, Rule 21(b) provides a discretionary mechanism for a district court to correct any injustice arising out of a peripheral prosecution.[4] As noted in Saavedra,

> Our constitutional rule—based on its history—requires that venue be linked to the nature of the crime charged and where the acts constituting it took place, and that the accused not be subject to the hardship of being tried in a district remote from where the crime was committed. Hardship on a defendant has been somewhat mitigated by Federal Rule of Criminal Procedure 21(b) which provides a defendant with an opportunity to have the venue fixed by the prosecution transferred to another one for the convenience of parties and witness and in the 'interest of justice.'

Saavadra, 223 F.3d at 88. See also United States v. Cores, 356 U.S. 405, 78 S.Ct. 875 (1958) (noting the "inherent flexibility" of Rule 21(b) to relieve the accused, "where possible, of the inconvenience incident to prosecution in a district far removed from his residence."); United States v. Griesa, 481 F.2d 276 (2d Cir.1973) (denying writ of mandamus to vacate order of district judge transferring pursuant to Rule 21(b) the prosecution of five securities

---

[4]   Federal Rule 21(b) provides that, "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice."

fraud defendants.); <u>Angotti</u>, 105 F.3d at 544 ("[T]he remedy is not to narrow criminal venue, but to permit easy transfer." (citing Charles A. Wright, Law of Federal Courts § 43, at 275 (5th ed. 1994)). <u>But Cf.</u> <u>Platt v. Minnesota Min. & Mfg. Co.</u>, 376 U.S. 240, 245, 84 S.Ct. 769, 772 (1964) (reversing the "erroneous holding . . . that criminal defendants have a constitutionally based right to a trial in their home districts."). These constraints provide the practical guideposts for determining whether a particular venue satisfies constitutional considerations, as well as the discretionary mechanism for a district court to remedy perceived injustices arising from peripheral prosecutions.

Ultimately, in <u>Ramirez</u>, the Court found that it "need not be concerned about jeopardizing the values underlying the substantial contacts test because [the defendant] d[id] not argue that being prosecuted in the [District] imposed an additional hardship on [him], prejudiced [him], or undermined the fairness of [his] trial." <u>Ramirez</u>, 420 F.3d at 143. Similarly, here, the defendants do not contend that they will suffer hardship, prejudice, or unfairness by being prosecuted here, rather than at the other end of the Brooklyn Bridge. The alleged false statements of Nwaigwe and Picone, while not made within the Eastern District, were allegedly made with the knowledge that those statements might be used in the Eastern District investigation. Thus, the allegations of the Indictment squarely dissipate any fear that this is a case where the false statements of the Defendants were arbitrarily, manipulatively, or even simply fortuitously transferred by the Government to an investigation in a far-off district, with the intent or effect of conferring venue in an unanticipated place away from the initial conduct of the defendants. Moreover, because venue would assuredly be proper in the Southern District of New York, and the Defendants have acknowledged that they would stand trial there, it is difficult to discern why that venue

would be significantly more convenient than the Eastern District of New York so as to justify a transfer under Rule 21(b), had such a motion been made. The Defendants' motion to dismiss for lack of venue is denied, though the motion may be renewed at the conclusion of the government's case, or if need be, at the completion of the entire case.

## II.     Defendants Motion to Dismiss the 18 U.S.C. § 1348 Charges

Defendants move to dismiss Counts One through Twenty-One of the indictment, for conspiracy to violate and the substantive violation of 18 U.S.C. § 1348, on the basis that the Indictment does not plead facts that, if proven true, would substantiate a finding that the statute has been violated and a crime has been committed. The standards for evaluating the sufficiency of an indictment on a motion to dismiss are well-established, and have recently been summarized by this Court.

> [T]he Court must treat the allegations in the indictment as true. See, e.g., United States v. Velastegui, 199 F.3d 590, 592 n. 2 (2d Cir.1999), cert. denied, 531 U.S. 823, 121 S.Ct. 67, 148 L.Ed.2d 32 (2000). The indictment is governed by Fed.R.Crim.P. 7(c), which requires only that it contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Therefore, to be legally sufficient, the indictment must specify the elements of the offense in sufficient detail to allow defendants to have notice of the charges against them and to permit them to plead double jeopardy in a future prosecution based on the same events. See, e.g., United States v. Walsh, 194 F.3d 37, 44 (2d Cir.1999). The Second Circuit has held that the indictment is legally sufficient if it tracks the statutory language of the offense charged, states the approximate time and place of the alleged crime, and contains some amount of factual particularity to ensure that the prosecution will not fill in the elements of its case with facts other than those considered by the grand jury. See id.

> Generally, the indictment does not have to specify evidence or details of how the offense was committed. See, e.g., United States v. Carrier, 672 F.2d 300, 303-04 (2d Cir.1982), cert. denied, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

<u>United States v. Coffey</u>, 361 F.Supp.2d 102, 11 (E.D.N.Y.2005).

18 U.S.C. § 1348 provides in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice–
    (1) to defraud any person in connection with any security . . . ;[5] or
    (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any security . . . ;

shall be fined under this title, or imprisoned not more than 25 years, or both.

The Court has identified no previous convictions under 18 U.S.C. § 1348. However, because the text and legislative history of 18 U.S.C. § 1348 clearly establish that it was modeled on the mail and wire fraud statutes, it is useful to be guided by the numerous and well-established precedents on those statutes in construing this statute. <u>See</u> <u>United States v. Ragosta</u>, 970 F.2d 1085, 1090 n.2 (1992) (applying mail and wire fraud precedents to construction of bank fraud statute, 18 U.S.C. § 1344). As a threshold matter, the government clearly need only prove a violation of subsection (1) or subsection (2), but not both, for there to be a violation of Section 1348. <u>Cf.</u> <u>United States v. Chandler</u>, 98 F.3d 711, 714 (2d Cir.1996) (finding plain error in a jury instruction that suggested the defendant must have violated both 18 U.S.C. § 1344(1) <u>and</u> § 1344(2) in order to establish bank fraud under 18 U.S.C. § 1344).

A violation of section 1348(1) requires proof of three elements: (1) fraudulent intent (2) a scheme or artifice to defraud and (3) a nexus with a security.

---

[5] The security must be "of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))." For ease of reference, the Court simply refers to "securities" as thus defined.

**A.    Satisfying the requirement of "in connection" with a security.**

Defendants argue that the Indictment is insufficient because it fails to allege that the defendants "intended to cause an economic loss to any holder or putative holder of the securities at issue." (Malin Mem. Supp. at 9) (emphasis added).  The statute, however, defines no such narrow range of prospective victims; it is sufficient that the Indictment alleges the defendants intended to defraud "any person in connection with any security." 18 U.S.C. § 1348(1) (emphasis added).  It does not restrict, or even contemplate, the status of the victim; rather, it simply requires that the government prove that the scheme to defraud was designed "in connection" with a security.  Stated another way, though not with the intention of identifying the outer boundary of the statute's application, the requirement that the scheme be "in connection" with a security is satisfied where as a result of the scheme, the defendants either benefitted, or attempted to benefit, from trading in securities. Cf. United States v. O'Hagan, 521 U.S. 642 (1997) (holding defendant had committed fraud "in connection with" a securities transaction when he misappropriated confidential information for trading purposes).  This broad construction is consistent with the report of Senator Leahy, the primary author of the statute, that the act "would create a new . . . felony for securities fraud-a more general and less technical provision comparable to the bank fraud and health care fraud statutes in Title 18." SAROX-LH 3, 2002 WL 32054437 (A&PSAROX).

A broad interpretation of who might be a victim under the statute is also consistent with precedent interpreting 18 U.S.C. § 1347, the health care fraud

statute. In <u>United States v. Lucien</u>, 347 F.3d 45 (2d Cir.2003), the Court of Appeals declined to adopt the defendant's narrow construction that the statute was intended to apply only to health care professionals.[6] In reaching its conclusion, the Court noted that "[t]he broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." <u>Id.</u> at 51. Similarly, the broad language of § 1348 shows that the intent of Congress was not only to protect the holders of securities, but to prohibit all forms of fraudulent conduct associated with securities, regardless of who the conduct affects.

## B.     Whether a scheme or artifice to defraud has been alleged

The second element of a § 1348(1) violation is a scheme or artifice to defraud. 18 U.S.C. § 1346 provides that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Though the Indictment does not specifically allege a deprivation of the intangible right of honest services, it need not for the Court to apply § 1346, because this section only provides a legal definition of criminal activity already encompassed and charged by the language tracking § 1348, that is "a scheme or artifice to defraud." <u>Cf.</u> <u>United States v. Rivera</u>, 415 F.3d 284, 287-88 (2d Cir.2005) (holding that jury instructions which provided "a legally accurate definition of a firearm . . . did not constructively amend the indictment"

---

[6]  Admittedly, the question of who can be an offender under the statute differs from the question of who can be a victim; however, the arguments proffered by the defendants are analogous in both cases, seeking to read into the statute a more restrictive view of the parties they regulate.

where the indictment had provided the defendants notice of the core of criminality for which he was tried and convicted).

The Court of Appeals has held that the deprivation of the intangible right of honest services has occurred, and provides the basis for a mail fraud conviction, where the defendants:

> use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer.

United States v. Rybicki, 354 F.3d 124, 127 (2d Cir.2003) (en banc). In Rybicki, the defendants, personal injury attorneys, were convicted of conspiracy and a mail and wire fraud in connection with payments to insurance adjusters that were intended to settle personal injury claims on favorable terms to their clients. To apply Rybicki's holding to a charge under 18 U.S.C. § 1348, it is necessary only to substitute "in connection with a security" for "use the mails or wire to."

This Court has previously and extensively discussed the holding of Rybicki. See United States v. Coffey, 361 F.Supp.2d 102, 115-119 (E.D.N.Y.2005). To summarize the principle limitation on the "seemingly limitless application" of 18 U.S.C. § 1346, Rybicki requires a "material" misrepresentation or omission, a standard that is broader than the "reasonably foreseeable harm" standard adopted in other circuits. "Neither [of the standards]," however, "requires an actual economic loss nor an intent to economically harm the employer." Id. (citing United States v. Vinyard, 266 F.3d 320, 327-29 (4th Cir.2001) cert. denied 536 U.S. 922, 122 S.Ct. 2587, 153 L.Ed.2d 777 (2002)). "[T]he reasonably

foreseeable harm test is met whenever, at the time of the scheme to defraud, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being." Coffey, 361 F.Supp.2d at 117. The materiality test only requires that the misrepresentation or omission "would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." Rybicki, 354 F.3d at 145. Thus, "'honest services' fraud is sufficiently pleaded where [the Indictment] alleges a perhaps unquantifiable harm inflicted on the defrauded entities which may, but does not necessarily result in, direct economic harm. Potential harm is the only prerequisite." Coffey, 361 F.Supp.2d at 118. This statement of the law is a conservative one, applying the statute only where potential economic harm may result. The materiality test adopted in Rybicki, requiring only that the omission would tend to lead a reasonable employer to change its conduct, does not even require that potential economic harm would result, but only that the employer would change its conduct in response. In any event, the alleged conduct in this case satisfies both standards, as the Brokerage Firms' reputations would likely be damaged, thus leading to economic harm, based on the exposure of its brokers' dual-allegiances. Cf. United States v. Frost, 125 F.3d 346, 369 (6th Cir.1997), cert. denied. 525 U.S. 810, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998) (affirming convictions of professors who knowingly accepted plagiarized dissertations from graduate students for defrauding the university on the basis that economic harm by virtue of damage to the university's reputation should have been foreseeable).

Also relevant to the question of harm, the Government has cited United States v. Carpenter, 484 U.S. 19, 25-26 (1987), for the principle that the misappropriation of confidential business information can be sufficient to support mail and wire fraud—and by

extension, securities fraud–convictions, even without proof of any intended monetary loss to the victims. In that case, defendants were engaged in an insider trading scheme involving the misappropriation of confidential information by a newspaper reporter from his employer, the Wall Street Journal, about articles that had not yet been published. Id. at 23-24. The Court reiterated the principle that "[c]onfidential business information has long been recognized as property," Id. at 26, en route to denying that "a scheme to defraud requires a monetary loss, such as giving the information to a competitor," and ruling it "sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." Id. Decided in the year's interim between McNally v. U.S., 483 U.S. 350, 107 S.Ct. 2875 (1987), which held "that the mail fraud statute does not reach 'schemes to defraud citizens of their intangible rights to honest and impartial government,'" Carpenter, 484 U.S. at 25 (citing McNally, 483 U.S. at 35), and the enactment of 18 U.S.C. § 1346 in 1988, which statutorily resurrected the reach of the law, Carpenter stands for the unremarkable proposition that the confidential information of an employer is a form of intangible property; and a scheme to defraud an employer of that information may provide the basis for a criminal conviction against an employee, whether or not any direct economic harm actually results from the fraud.

The parties have discussed at length whether the allegations in this case meet the formal elements of a traditional "front running" scheme, well-described in United States v. Dial, 757 F.2d 163, 165-66 (7th Cir.1985):

> The greatest danger of preferential access comes from the brokers, who often trade on their own account as well as for their customers. Brokers have more information than any of their customers because they know all their

customers' orders. Suppose a customer directs his broker to buy a large number of silver futures contracts. The broker knows that when he puts this order in for execution the price will rise, and he can make it rise further if he waits to execute the order until he can combine it with other buy orders from his customers into a "block" order that will be perceived in the market as a big surge in silver demand. If, hoping to profit from this knowledge, the broker buys silver futures on his own account just before putting in the block order and then sells at the higher price that the block order generates, he will hurt his customers. His purchase (if substantial) will have caused the market price to rise just before the block order went in, and thus the price that his customers pay will be higher than otherwise; and his sale will cause the price to fall, and thus reduce the value of his customers' contracts. So if "trading ahead"-as the practice of a broker's putting in his own orders for execution ahead of his customers' orders is called-became widespread, customers would realize that the market was rigged against them.

Id. at 165-66. Defendants attempt to undermine the Indictment by formally distinguishing the allegations from a traditional front-running scheme in three ways: First, they argue that the institutional orders did not come from the Defendant brokers' customers, per se, but from customers of other brokers within the firm; second, the brokers did not affirmatively withhold the orders from the market; and third, the brokers, themselves, did not actually trade based on those orders, but merely sold access to that information to the Day Traders. Whether or not a classic "front-running" scheme has been alleged, however, is immaterial, as front-running is but one of the "loopholes in statutes prohibiting specific frauds" that the "mail and wire frauds have often been used to plug." Dial, 757 F.2d at 169. The evanescence of the Defendants' attack on the front-running allegation becomes apparent when one considers that the failure to disclose a material omission may, in any event, constitute fraud. In the language of Dial:

Fraud in the common law sense of deceit is committed by deliberately misleading another by words, by acts, or, in some instances-notably where there is a fiduciary relationship, which creates a duty to disclose all material facts-by silence. See Prosser and Keeton on the Law of Torts §§ 105-06 (5th ed. 1984). Liability is narrower for nondisclosure than for active

26

misrepresentation, since the former sometimes serves a social purpose; for example, someone who bought land from another thinking that it had oil under it would not be required to disclose the fact to the owner, because society wants to encourage people to find out the true value of things, and it does this by allowing them to profit from their knowledge. See Laidlaw v. Organ, 15 U.S. (2 Wheat.) 178, 195, 4 L.Ed. 214 (1817); Kronman, Mistake, Disclosure, Information, and the Law of Contracts, 7 J. Legal Stud. 1 (1978). But if someone asks you to break a $10 bill, and you give him two $1 bills instead of two $5's because you know he cannot read and won't know the difference, that is fraud. Even more clearly is it fraud to fail to "level" with one to whom one owes fiduciary duties. The essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market. Hence the principal is not armed with the usual wariness that one has in dealing with strangers; he trusts the fiduciary to deal with him as frankly as he would deal with himself-he has bought candor.

Dial, 757 F.2d at 168. See also 2 L. Sand, et al., Modern Federal Jury Instructions, Inst. 44-4 (Existence of a Scheme or Artifice to Defraud) (2005) ("The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such disclosure with the intent to defraud.") (emphasis added). The essential fraud alleged by the Indictment is not a traditional "front-running" scheme, though it might aptly be described as "front-running by proxy," but the misappropriation of confidential information by the brokers and the failure to disclose to their employers that they were selling access to that information. Thereby, the Brokerage Firms were allegedly defrauded of confidential information, and both the Brokerage Firms and the firms' institutional clients were defrauded of the intangible right of honest services.

## C.    The requirement of fraudulent intent

Though the text of the statute does not explicitly require the intentional mens rea,

precedent compels this Court to read into 18 U.S.C. § 1348 the well-established requirement of fraudulent intent, which is requisite to a conviction under the other federal fraud statutes. In <u>Chandler</u>, the Court of Appeals interpreted the identical mens rea language of 18 U.S.C. § 1344.[7] The court held, without noting the absence of an explicit "intent" or "willfulness" requirement from the text of the statute, that to establish a violation, the Government must prove "the defendant engaged in or attempted to engage in a pattern or course of conduct designed to deceive . . . with the <u>intent to victimize</u> the institution by exposing it to actual or potential loss." <u>Chandler</u>, 98 F.3d at 715 (emphasis in original). The fraudulent intent requirement is also implied in the securities fraud statute, which addresses similar kinds of conduct and offenses. Fraudulent intent typically requires a showing of "intent to deceive and intent to cause actual harm." <u>United States v. Stavroulakis</u>, 952 F.2d 686, 694 (2d Cir.1992). However, "when the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." <u>United States v. D'Amato</u>, 39 F.3d 1249, 1257 (2d Cir.1994) (citations omitted). And where the scheme results in the deprivation of honest services, "actual or intended economic or pecuniary harm need not be established . . . '[T]he only intent that need be proven . . . is the intent to deprive another of the intangible right of honest services.'" <u>Rybicki</u>, 354 F.3d at 145 (quoting <u>United States v. Sancho</u>, 157 F.3d 918, 921 (2d Cir.1998), cert. denied 525 U.S. 1162, 119 S.Ct. 1076, 143 L.Ed.2d 79 (1999)).

### D.    Application of the law

---

[7]  18 U.S.C. § 1344 imposes criminal liability upon "<u>[w]hoever knowingly executes, or attempts to execute, a scheme or artifice</u>– (1) to defraud a financial institution; or (2) to obtain any of the . . . property owned by, or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises." (emphasis added). The emphasized language is identical to the language of 18 U.S.C. § 1348.

Against this understanding of the statute, the Court holds that the Indictment sufficiently states a crime under 18 U.S.C. § 1348(1). It is indisputable that the alleged scheme was in connection with securities. If the allegations in the Indictment are proven true, a jury could conclude that there existed a scheme either to deprive the brokerage firm and its clients of the intangible right to honest services, or the Brokerage Firms of their confidential information. Tracing the <u>Rybicki</u> language, one could conclude that the defendant stockbrokers, purportedly acting in the interest of the Brokerage Firms, secretly acted in their own and the day traders' best interest by surreptitiously selling access to the non-public institutional investors' orders, and made a material omission to their employer by failing to disclose their relationships with the day traders. Notably, <u>Rybicki</u> identified two classes of cases typically found in prosecutions brought under 18 U.S.C. § 1346 – bribery cases and kickback cases. In a paradigmatic bribery case, such as the one alleged here, "a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment." <u>Rybicki</u>, 354 F.3d at 139. Additionally, a jury could find that the institutional orders were confidential proprietary information of the Brokerage Firms, and the scheme to misappropriate that information fraudulent. As to intent, a jury could conclude that the deprivation of honest services or misappropriation of information was the necessary result of the scheme, and thus infer the requisite mens rea.

Finally, even though the Watley defendants may not have had a duty to the Brokerage Firms or the firms' clients, and thus might not have committed the substantive § 1348(1) offense directly, it is axiomatic "that a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a

co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." Cephas v. Nash, 328 F.3d 98, 101 n.3 (2d Cir.2003) (citing Pinkerton v. United States, 328 U.S. 640, 646-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). A jury could conclude that, having entered the conspiracy charged under § 1349, the day traders should reasonably have foreseen the brokers' substantive violation of § 1348(1).

Because the Indictment satisfactorily alleges a crime under 18 U.S.C. § 1348(1), and the government need only prove a violation of a single subsection to support a conviction under 18 U.S.C. § 1348, the Defendant's motion to dismiss for insufficiency of the Indictment must be denied. However, defendants have also argued that the Indictment does not properly allege a violation under § 1348(2), because the Indictment "does not contain a single allegation of any false representation made by anyone in connection with any of the securities transactions." (Def. Mem. Supp. at 12-13). Only a few words need be written on this point.

Defendants' contention that absent an affirmative misrepresentation a fraud conviction cannot be obtained is unbuttressed by any precedent, and indeed is contrary to Second Circuit opinions citing fraudulent omissions, where the defendant has a duty to disclose them, as a basis for conviction. See, e.g., Rybicki, 354 F.3d at 142 ("actions were not disclosed to the employer insurance companies, and hence were accompanied by a material omission."); United States v. Szur, 289 F.3d 200 (2d Cir.2002) (affirming conviction of brokers for deprivation of the intangible right of honest services where brokers breached a duty to disclose commissions to customers). Indeed, Rybicki specifically provides that a crime may have been committed where the scheme to defraud is

accompanied by an "omission of [material] information disclosed to the employer." Rybicki, 354 F.3d at 127.

The only support Defendants offer for their position, a single case from the Southern District of New York, U.S. v. Bongiorno, Slip Copy, 2006 WL 1140864 (S.D.N.Y.2006), is easily distinguished. In that case, securities "specialists"[8] were charged with trading ahead and interpositioning trades from their private accounts, in violation of, inter alia, 17 C.F.R. § 240.10b-5(b), which makes it a violation "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Dismissing one of the charges of the Indictment that alleged a violation of this subsection, but upholding the rest of the Indictment, the court observed that "neither the indictment nor the government's response to defendants' motion for a bill of particulars identifies any statements whatsoever made by defendants, let alone any that were rendered misleading by virtue of defendants' omissions." Bongiorno, 2006 WL 1140864 at *7. In the absence of any statement, an omission – even a fraudulent omission – may not give rise to liability under 17 C.F.R. § 240.10b-5(b). However, and significantly, the Court upheld the charge of the Indictment, based on the same conduct, which alleged a violation based on 17 C.F.R. § 240.10b-5(a). That subsection makes it a violation, in the trading of securities, "to employ any device, scheme, or artifice to defraud." Denying defendants' motion to dismiss that charge, the Court observed:

---

[8] "The job of a specialist is to act, in essence, as an auctioneer: the specialist matches offers to sell securities from some customers with bids to buy from others. If there is an open order to buy and a matching one to sell, the specialist, pursuant to NYSE rules, must match the buyer with the seller. These are called "agency" or "broker" trades, for which the specialist generally receives no compensation." Bongiorno, 2006 WL 1140864 at *1.

By allegedly taking positions as specialists who are required by NYSE rules to match customer orders whenever possible and instead trading for their own accounts to profit at the expense of existing public orders, defendants can properly be found to have tended to deprive their public customers through fraud or stealth. Put simply, defendants' customers were led to believe one thing when another was true-and this deception was integral to the alleged scheme to defraud because had defendants' customers known the truth, they may have shaped their orders differently (viz., by specifying a narrower price window to prevent the specialist from capturing the spread between the offered sell price and the offered buy price) or not placed orders at all.

Bongiorno, 2006 WL 1140864, at *7. The essence of the deception alleged against the defendants in Bongiorno is similar to that of the Defendants in this case. Contrary to the Defendants' argument that "[a]ll the AB Watley brokers did in connection with th[e] transactions was to buy or sell securities at the market price" based on information that they "overheard," (See Def. Mem. Supp., at 10, 3), Defendants' argument ignores the essential deceptiveness of the conduct alleged: While technically correct that the day-traders "overheard" the content of the squawk box communications, the use of the word "overhear" suggests passivity antipodal to the allegations in this case. The Defendants allegedly conspired to allow the Watley traders to covertly procure access to nonpublic information of the Brokerage Firms in exchange for bribes to the brokers. If, in fact, such a scheme existed, no affirmative misrepresentation need be proved because the employee brokers owed a duty to their employers that would have been breached by the failure to disclose the material fact of payments in exchange for access to internal communications. "The question is . . . whether a reasonable jury could find that the alleged fraud involved an act or acts of deception." Bongiorno, 2006 WL 1140864 at *6. With this understanding, and a similar application of co-conspirator liability, the Court rules that the Indictment satisfactorily states a violation of 18 U.S.C. § 1348(2).

In light of this ruling, Defendants' argument that the Rule of Lenity or Due Process considerations prevent the application of the statute must be rejected. "The [Rule of Lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers. That is not the function of the judiciary." Callanan v. U.S., 364 U.S. 587, 81 S.Ct. 321, 326 (1961) (Frankfurter, J.). Defendants make much of the fact that there has been a dearth of prosecution under 18 U.S.C. § 1348, and contend that "the government is attempting to predicate criminal liability on alleged conduct that, at best, is on the far edges of the securities laws' scope." These arguments, however, fail to consider that the essential dishonest and fraudulent conduct with which the Defendants are charged is not unique; schemes to provide kickbacks and bribes in exchange for confidential information or some other valuable but otherwise unattainable benefit recur frequently in violation of the law. Indeed, the present scheme might well have been charged either as a more general mail and wire fraud or a more specific 10-b(5) securities fraud. The fact that a relatively new statute has been enacted to broadly address a particular subset of those frauds – those which are conducted in connection with securities – does not provide a basis for concluding that the dishonesty and unlawfulness of such a scheme had been previously unknown in the minds of men. The foregoing analysis construing the statute by analogy to similar crimes and similar statutes provides ample demonstration that this statute is far from ambiguous and the Rule of Lenity and Due Process considerations have no application to the propriety of this Indictment.

## **CONCLUSION**

For the foregoing reasons, the Defendants' motions to dismiss for insufficiency of

the Indictment are denied. The motions to dismiss for lack of venue are denied, though

Defendants are granted leave to renew the venue motions at the completion of the case.


SO ORDERED.

Dated:      Brooklyn, New York
            August 2, 2006

                                    _____/s/_____

                                    I. Leo Glasser
                                    United States Senior District Judge


Copies of the foregoing memorandum and order were electronically sent to:

Counsel for the Government

Michael Anthony Asaro
Email: Michael.Asaro@usdoj.gov

Counsel for the Defendant

Stephen P. Scaring                          Email:  jbm@maffeolaw.com
Email: sscaring@scaringlaw.com
                                            Thomas F.X. Dunn
Mildred M. Whalen                           Email: ThomasDunnLaw@aol.com
Federal Defenders of New York, Inc.
Email: mildred_whalen@fd.org

Jeffrey C. Hoffman
Hoffman Pollok LLP
Email: jchoffman@hpplegal.com

Roland G. Riopelle
Sercarz & Riopelle LLP
Email:
rriopelle@sercarzandriopelle.com

Donna R. Newman
Email: donnanewmanlaw@aol.com

J. Bruce Maffeo