UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,

           -against-

KENNETH E. MAHAFFY, JR., TIMOTHY J.
O'CONNELL, DAVID G. GHYSELS, JR.,
ROBERT F. MALIN, LINUS NWAIGWE, and
KEEVIN H. LEONARD,

                *Defendants*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
AND ORDER
05-CR-613(JG)

A P P E A R A N C E S :

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:   Jonathan Green
        James McMahon
        *Attorney for the United States of America*

    ANDREW J. FRISCH
        950 Third Avenue, 15th Floor
        New York, New York 10022
        *Attorney for Kenneth E. Mahaffy, Jr.*

    FEDERAL DEFENDERS OF NEW YORK
        16 Court Street
        Brooklyn, New York 11201
    By:   Mildred Whalen
        *Attorneys for Timothy J. O'Connell*

    HOFFMAN & POLLAK
        260 Madison Avenue
        New York, New York 10024
    By:   Jeffrey Hoffman
        Susan C. Wolfe
        *Attorneys for David G. Ghysels, Jr.*

    LAW OFFICES OF MARC FERNICH
        750 Lexington Avenue, 15th Avenue
        New York, New York 10022

> By: Marc Fernich
> *Attorney for Robert F. Malin*
>
> DONNA R. NEWMAN
> 445 Park Avenue, 14th Floor
> New York, New York 10022
> *Attorney for Linus Nwaigwe*
>
> THOMAS F.X. DUNN
> 7 Dey Street, Suite 1101
> New York , New York 10007
> *Attorney for Keevin H. Leonard*
>
> GOLUB & GOLUB LLP
> 225 Broadway, Suite 1515
> New York, New York 10007
> By: Mitchell Golub
> *Attorneys for Keevin H. Leonard*

JOHN GLEESON, United States District Judge:

The six defendants who went to trial in this case and were found guilty by the jury have moved for a dismissal of the indictment, or, in the alternative, for a new trial, on the ground that the government failed to disclose the transcripts of 12 depositions taken by the Securities and Exchange Commission ("SEC"), which the defendants claim violated the government's disclosure obligations. For the reasons set forth below, the motion is denied.

## BACKGROUND

Familiarity with the extensive procedural history of this case, which is now five years old, is assumed.

In a three-week trial commencing March 30, 2009, six of the defendants in superseding indictment "S-5" were tried before me on a single charge. Three of them, Kenneth A. Mahaffy, Jr., Timothy J. O'Connell and David G. Ghysels, Jr., were stock brokers. At times relevant to the indictment, Mahaffy worked at Merrill Lynch and Smith Barney; O'Connell worked at Merrill Lynch; and Ghysels worked at Lehman Brothers. The other defendants,

2

Robert Malin, Linus Nwaigwe and Keevin Leonard, all worked at A. B. Watley, Inc. ("Watley"), a broker dealer engaged primarily in the practice of day trading -- a stock-trading strategy that produces a high volume of trades that consist of buying and selling securities within short periods of time, seeking to profit from slight changes in the market price during those short time periods.

The defendants were charged with conspiring to (1) defraud the brokerage firms of their right to the honest services of their employees (*i.e.*, Mahaffy, O'Connell or Ghysels, as the case may be); and (2) obtain and misappropriate confidential information (about customer orders) belonging to the brokerage firms, all in connection with securities of companies that had filed registration statements with the SEC, in violation of 18 U.S.C. § 1349. The jury was not only instructed that unanimity was required as to either or both of the objectives of the charged conspiracy, it was asked to render separate verdicts on each, and on April 22, 2009, all defendants were found guilty of violating § 1349 both by agreeing to deprive the brokerage firms of the honest services of their employees and by agreeing to misappropriate the brokerage firm's confidential information. This latter theory of liability was founded on *Carpenter v. United States*, 484 U.S. 19 (1987), which held that the impermissible prepublication use by an employee of *The Wall Street Journal* of confidential business information belonging to the newspaper constituted a scheme to defraud of "property" protected by the mail and wire fraud statutes. 484 U.S. at 25. Although the defendants' motions challenge their convictions in their entirety, the gist of their arguments, and particularly the heavy emphasis in both the written submissions and the oral argument on the claim that the undisclosed depositions would have helped them prove

the business information in question was not confidential, relates more directly to the second objective of the charged conspiracy.[1]

A. *The Scheme to Defraud*

The charged scheme centered on the brokerage firms' use of "squawk boxes," internal broadcast systems that disseminated information throughout the firm. The information that came over the squawk boxes varied in nature, but some of it was sensitive and valuable information about pending orders of the firm's clients to buy or sell blocks of stock -- on occasion very large blocks of stock. A principal purpose of disseminating the information within the firm was to permit the firm's brokers to find "the other side of that trade." Tr. 220. If, for example, Client A placed an order to buy 100,000 shares of IBM stock, a broker who learned of that order over the squawk box might fill part of that order because Client B wished to sell 5,000 shares of IBM. That would allow part of the order to be filled without affecting the price of the shares, and would also allow the brokerage firm to collect commissions from both Clients A and B. The brokers might also use the information about the buy order by calling Clients C through Z and affirmatively inquiring as to whether they might provide all or part of the other side of the IBM trade. In this manner, the firm's confidential, proprietary information (the buy order from Client A) would be directly or indirectly disseminated outside the firm (through the brokers' inquiries of those clients) in an effort "to provide liquidity to [Client A]." Tr. 220.

There was much testimony at trial about the need for discretion and good judgment on the part of the brokers in this regard. For example, a broker should not call a client that never trades in technology stocks to ask if they want to sell a large block of IBM stock,

---

[1] The first objective of the charged conspiracy implicated the controversial "honest services" theory of mail and wire fraud that was a subject of the recent decision in *Skilling v. United States*, No. 08-1394, 2010 WL 2518587 (U.S., June 24, 2010). The conduct in this case, which included evidence of bribes to the broker defendants, remains within the ambit of the statute as narrowed by the Supreme Court in *Skilling*.

because that would divulge the confidential information of Client A's order (thereby potentially affecting the market price for those shares) in circumstances that would provide little chance of providing a seller of the IBM stock. Similarly, even when speaking to clients who trade in technology stocks, a broker should not say that the firm wants to buy 100,000 shares if that client historically has traded only in lots of 5,000 shares. That would divulge more information than necessary to meet the liquidity needs of Client A.

In sum, the evidence at trial established that some of the information broadcast over the squawk boxes -- information about actual client orders, which were identifiable among the other transmissions due to certain accompanying words, such as "natural" or "print" -- was confidential information of the brokerage firm. "Confidential" in this context did not mean that the content of the client's order could never be revealed in any form; to the contrary, an effort to get another of the firm's clients to take all or part of the other side of the trade often required disclosure, at least indirectly, of at least part of the information about the original client's order.

This need for a legitimate purpose on the part of the brokers, and the subtleties that surround the broker's "filtering system as to how and why [the broker] will call clients in the hopes of finding the other side of that trade," Tr. 221, did not dilute the clarity of the factual theory that lay at the heart of the government's case: the information disseminated over the squawk boxes could not properly be sold to day traders who would *never* take the other side of the trade but rather would try to profit by quickly trading ahead of the block orders they learned about from the squawk boxes. That was what the defendants were charged with doing in this case.

Specifically, the broker defendants were charged with providing to the day traders at Watley live access to the brokerage firms' squawk boxes. In the morning before the trading

5

began, the broker defendants would call Watley. Once the connection was established, the broker defendants would place the telephone receiver next to the broker's squawk box so the traders at Watley could listen all day long to the transmissions. Those transmissions included a significant amount of chaff, such as mere indications of interest in certain stock. But they also included some wheat -- actual orders to buy or sell stock in large enough blocks that filling those orders could result in a movement in the market price for those stocks. The Watley traders' business plan was to pay for the right to listen to the squawk box transmissions and trade ahead of certain orders they heard about over them. Watley never took the other side of any orders, and it never served the interests of the brokerage firms or their clients to have the clients' orders shared with Watley. The evidence showed, however, that it served the interests of the broker defendants, because Watley paid them for access to squawk boxes, either in cash or through "wash trades," paired purchases and sales of the same stock made for no reason other than to generate commissions for the broker defendants.

There was ample evidence of guilt at trial. Four accomplice witnesses testified about the scheme; documentary evidence corroborated their testimony, and several defendants evidenced a consciousness of guilt in different ways.

B.  *The Undisclosed Deposition Testimony*

The indictment in this case arose out of an SEC investigation into allegations that brokers at major brokerage firms were piping their firms' squawk box information to day traders. Robert Murphy, a branch chief in the SEC's Division of Enforcement, so testified at the trial. He also testified that during the course of that investigation, he took sworn testimony from various witnesses, including the defendant Linus Nwaigwe. The others who participated in that investigation included Sandeep Satwaleker, another attorney at the SEC.

6

In May 2009, after the jury found the defendants guilty in this case, the SEC initiated administrative proceedings against Mahaffy, seeking that he be barred from any further association with a broker or dealer or investment advisor. In connection with that proceeding, the SEC made available to Mahaffy's counsel in December 2009 voluminous materials generated by its investigation, including the deposition transcripts on which the instant motion relies. The motion, made by Mahaffy, has been joined in by the other defendants.

C.  *The Materiality of the Deposition Testimony*

The main thrust of the defendants' motion is that the withheld deposition testimony would have helped the defense undermine a basic premise of the government's case, that is, that the squawk box transmissions contained confidential information belonging to the brokerage firms. The defendants contend that "the government knew of more than *ten* employees of the brokerage firms who believed that squawks were *not* confidential" and failed to identify those employees or disclose their testimony, in violation of the disclosure obligations established by *Brady v. Maryland*, 737 U.S. 83 (1963). Mahaffy Brief (docket entry 853) at 2, 26.

I find this argument unpersuasive. The witnesses at issue were subjected to lengthy and often repetitive questions about, among many other things, the proper use of squawk boxes and the information disseminated through them. Though there are snippets of testimony here and there that, viewed in isolation, support the proposition that the squawk box communications were not confidential, each witness's testimony, viewed as a whole, actually supports the government's theory of the case. Most importantly, to the extent there was any context at all, the testimony at issue addressed the use of squawk box information for the legitimate purpose of getting another client of the brokerage firm to take the other side of the

7

trade. None of the testimony on which the motion relies even remotely supports the proposition that it would be permissible to sell squawk box information to day traders so they could try to trade ahead of block orders.[2]

So, for example, Mahaffy contends that Brian Hull of Merrill Lynch testified that, in his view, squawk box information was not confidential. But in fact Hull's testimony, read fairly, shows that he believed client orders and client relationships were always confidential, and squawk box transmissions about orders needed to be handled with caution in a broker's effort to find the other side of the trade. Hull SEC Dep. Tr. at 7, 10-11. Similarly, the only fair reading of the testimony of Leo Ressa of Merrill Lynch is that a broker using the order information transmitted over the squawk box had to honor his fiduciary responsibility to the client who placed that order, and the filtering process that responsibility required precluded allowing other clients of the firm to listen to the squawk box. Ressa SEC Dep. Tr. at 46-47, 66. And though Robert Moore of Smith Barney preferred the term "sensitive" to "confidential" in describing the order information contained in squawk box transmissions, he testified to the dangers of people trading ahead of the orders and that he would have objected to a Smith Barney broker putting a phone up to a squawk box like the defendants did here. Moore SEC Dep. Tr. 31-32, 90-93. The same is true for many of the remaining deponents.[3]

---

[2] The government suggests that because Mahaffy asserted inconsistent defenses in his two trials, he could not have a successful *Brady* claim even if the undisclosed testimony established that it was permissible to provide squawk box transmissions to day traders. At the first trial, which resulted in a mistrial of the conspiracy charge that was later tried before me, Mahaffy's defense was not that it was permissible to put a telephone up to the squawk box for day traders to listen in, or that he would have gotten approval of such a practice from his supervisors, but rather that he did not in fact do it. 2007 Trial Tr. 4207-09. That prior testimony, the government contends, would have been admissible against Mahaffy at the second trial, and therefore it cabined the use to which he could put the withheld deposition testimony. Mahaffy disagrees, asserting what he calls "the absolute right to advance inconsistent defenses." Letter from Andrew Frisch, Esq, to the Court dated March 29, 2010 (docket entry 873) at 6. Because I conclude the testimony at issue here was insufficiently material to warrant relief, I need not resolve this dispute.

[3] *See* Michael Legieza SEC Dep. Tr. at 30-31 (stating that "the purpose of disseminating the information [from the squawk box] is to facilitate a transaction"); Michael John Lynch SEC Dep. Tr. at 30 ("[T]he

8

Mahaffy makes much of the testimony of Joseph Lauricella and Ronald Ledwith, the branch manager and a broker, respectively, in the Montvale, New Jersey office of Merrill Lynch, but their testimony does not bear the weight Mahaffy places on it. The connection between Lauricella and Ledwith and the case before me was Matt Shulman, a broker trainee in their office in Montvale. One of Shulman's clients was Millennium Brokerage LLC. Warren Fellus, one of the four accomplice witnesses in the case, left Watley to head the trading desk at Millennium's New York office. For a brief period while Fellus was at Millennium, Shulman provided him access to Merrill Lynch's squawk box, which Fellus used to trade ahead of the client orders he learned about over the box.

In their SEC depositions, Lauricalla and Ledwith testified that Shulman had asked them for access to the Merrill Lynch squawk box so he could in turn allow Millennium to listen to it. Both at the time and after an article appeared in *The Wall Street Journal* about the arrests in this case, either Lauricella or Ledwith or both spoke to others at Merrill Lynch about the propriety of disseminating the squawk box transmissions outside the firm. Both testified to the SEC, in essence, that they learned it was permissible to disseminate the information to other clients outside the firm. Lauricella SEC Dep. Tr. at 48-50, 65-68, 72-76; Ledwith SEC Dep. Tr. at 53-54, 67-69.

There are several flaws in the defendants' argument that the failure to disclose the testimony of these witnesses deprived them of a fair trial. Much of the testimony would likely have been inadmissible if offered at trial. Its probative value would also have been seriously

---

role of the sales trader is not to make every call of every name that goes out on the squawk to every client every day. That's absolutely what we discourage them to do."); Jeffrey N. Edwards SEC Dep. Tr. at 50 ("The content [of the squawk box] became available and individuals that had access to the content needed to use appropriate judgment and discretion on how to use it."); Dante Ferrarie SEC Dep. Tr. at 30, 41-42 ("I think that the squawk is private information … I think some traders use it to go out on things and I just felt like that was private to us, and, you know, they were taking something or accessing something that we didn't allow" and stating that it was inappropriate and unnecessary to give information regarding customer orders to an employee who never involved a client in filling the other side of the order.).

diminished by, among other things, the witnesses' admitted limited understanding of squawk boxes. But I need not fully address those arguments because the testimony at issue and the additional testimony Mahaffy claims it would have led to share a critical defect: it was based on the incorrect premise that Millennium was being provided the squawk box information so it would take the other side of the Merrill Lynch customer orders it heard about, providing liquidity for the clients who placed the orders and additional commissions for Merrill Lynch. Lauricella and Ledwith were told as much by Shulman. Lauricella SEC Dep. Tr. at 81-82, Ledwith SEC Dep. Tr. 26, 46. Thus, whereas the testimony of these witnesses (or the others at Merrill Lynch they said they spoke to) might conceivably have had a bearing on how brokers may permissibly use order information for the proper purpose of finding the other side of trades, it would not have helped the defendants, where the essence of the charged conspiracy was an agreement to *sell* the order information to day traders with no history of (or interest in) covering the other side of Merrill Lynch trades so those day traders could try to profit from the illicitly-obtained information. Indeed, Lauricella expressly testified to the *inappropriateness* of using information about client orders for the purpose of trading in front of the execution of those orders in the hope of getting a better price than the client would get. Lauricella SEC Dep. Tr. at 82. That was precisely the purpose of the charged scheme -- to give the day traders the information transmitted over the squawk boxes so they could quickly trade in front of the execution of those orders, hoping to profit from the anticipated market impact those orders would have.

The Second Circuit has provided the following guidance with regard to claims like the one before me now:

> "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia,* 547 U.S. 867, 869, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006). Evidence that is not disclosed is suppressed for *Brady* purposes even when it is "known only to police investigators and not to the prosecutor."

> *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence is favorable if it is either exculpatory or impeaching. *See, e.g., Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood,* 547 U.S. at 870, 126 S.Ct. 2188 (internal quotation marks omitted). However, a "'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,'" *id.* (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555), but only a "'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,'" *Youngblood,* 547 U.S. at 870, 126 S.Ct. 2188 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555). The assessment of materiality is made in light of the entire record. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

*United States v. Triumph Capital*, 544 F.3d 149, 161 (2d Cir. 2008). Having presided over the trial of the case and having reviewed all of the undisclosed testimony, my assessment is that there is no reasonable probability that the result of the proceeding would have been different if the SEC testimony had been disclosed to the defendants prior to trial.[4]

Notwithstanding the foregoing, I remain mystified by the government's failure to disclose the testimony of these various witnesses. I see no legitimate interest served by an approach that has the parties and the Court sifting through the transcripts of testimony taken by the SEC *after* the trial has already occurred -- especially when the testimony was taken as part of

---

[4] The defendants also allege that the deposition testimony of Kathryn Curran, Carlos Romero and Donald Lee was materially exculpatory. I disagree. They contend that Curran's testimony demonstrated that Merrill did not have a policy regarding the squawk box. Mahaffy Brief (docket entry 853), at 44. But the absence of a policy regarding the squawk boxes was prominent at trial from beginning (*e.g.,* Tr. 28) to end (*e.g.,* Tr. 2452-53), and it was not inconsistent with the jury's finding that the defendants agreed that the broker defendants would sell to the day trader defendants information they all knew was the confidential business information of the brokerage firms. Second, the defendants argue that portions of Romero's deposition testimony addressing his meeting with Jay Amore, a government witness who testified at the trial, would have undermined Amore's credibility. *Id.* at 51-55. Amore was cross-examined extensively at trial, and I have no doubt that additional cross-examination about his failure to mention a meeting with Romero would not have changed the jury's verdict. Ghysels's separate arguments based on the deposition of Romero are meritless and rejected. Lastly, the defendants argue that the testimony of Donald Lee would have rebutted the government's interpretation of an email from Mahaffy to Lee, in which Mahaffy asked Lee if he needed to be "hooked up". *Id.* at 55-58. The government argued at trial that Mahaffy was offering to give Lee access to the squawk box. In his deposition, Lee was never confronted with the email or the phrase "hooked up." Rather, he stated only that he did not trade in front of client orders. Even crediting Lee's testimony, it does not negate the government's argument that Mahaffy offered to give him access to the squawk box information to enable him to trade ahead of orders. Taken as a whole and in conjunction with the other evidence discussed above, I find that there is not a reasonable probability that the testimony of these witnesses would have altered the jury's verdicts.

the investigation that resulted in this very case. Nor do I see a justification for the decision by the government's trial team (which did not include any members of the team that handled the original trial) not to reconsider the disclosure decisions made by their predecessors. The disclosure obligations imposed by the federal rules, federal statutes and the Constitution are too important, and too easily complied with, to justify such an approach. Even if the prosecutors are not sufficiently motivated, as they should be, by the defendants' interest in a fair trial, one would think the government's selfish interest in the integrity and durability of the convictions it obtains would induce it to consider its disclosure obligations on an ongoing basis, and to err on the side of over-disclosure unless well-grounded concerns about particular witnesses or other investigations counsel otherwise. My only concern in denying the pending motion is that it might have the effect of diminishing that selfish incentive. The government has assured me otherwise, and that changes have been made in the United States Attorney's office to ensure that similar failures do not occur in the future. Time will tell in that regard, but I note here that those procedures ought to include a requirement that the prosecutors in the case make contemporaneous records of their actions and decisions regarding disclosure in a manner that makes them accessible later on. In this case, an email record reveals that one of the prosecutors in the first case asked his colleagues whether a particular excerpt of Brian Hull's testimony was subject to disclosure pursuant to *Brady*. In my view it was not, but there is no record of the other prosecutors' answer to that question (though the government concedes the testimony was not disclosed), and the former AUSAs to whom it was directed now have no recollection of even addressing the question. Whatever else the United States Attorney does in response to the disclosure guidance recently provided by then-Deputy Attorney General David W. Ogden, it should make sure that it can provide a complete accounting of its actions in future cases.

The defendants' request for a "factfinding hearing" into the intent or good faith of the prosecutors involved is denied. I have little doubt that there was no intentional effort to suppress the subject deposition transcripts. Among the many indicia of that is the fact that the government itself presented testimony at trial that the depositions were taken. In any event, my principal concern here is determining the effect of the nondisclosure of the deposition testimony at issue on the defendants' right to a fair trial. Because in my view that effect was negligible, the motion to dismiss the indictment or for a new trial is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 21, 2010
       Brooklyn, New York